ROSMAN & GERMAIN APC
Daniel L. Germain (Bar No. 143334)
5959 Topanga Canyon Boulevard
Suite 360
Woodland Hills, CA  91367-7503
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

Counsel for Plaintiffs and the Putative Class
[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS SIMONELLI, DAVID VILLARREAL, JOSEPH DOUILLARD, MARC RUNYARD, MARK TRACEY and ROBERT RAMIREZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SALESFORCE.COM, INC., BOARD OF DIRECTORS OF SALESFORCE.COM, INC., MARC BENIOFF, THE INVESTMENT ADVISORY COMMITTEE, JOSEPH ALLANSON, STAN DUNLAP, and JOACHIM WETTERMARK, <br><br> Defendants. | CIVIL ACTION NO.: <br><br> **CLASS ACTION COMPLAINT** |

Plaintiffs Chris Simonelli, David Villarreal, Joeseph Douillard, Marc Runyard, Mark Tracey and Robert Ramirez ("Plaintiffs"), by and through their attorneys, on behalf of the Salesforce 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Salesforce.com, Inc. ("Salesforce" or the "Company"), the Board of Directors of Salesforce ("Board") and its members during the Class Period, and the Investment Advisory Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

3.      The U.S. Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v,. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).[2]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

8.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

9.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the market place to ensure that well-performing, low cost investment options are being made available to plan participants.

10.      The Plan had over $2 billion in assets at the end of 2018 that were/are entrusted to the care of the Plan's fiduciaries. By 2021, the Plan's assets increased exponentially to over $6 billion dollars. The

---

[2] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-lookat-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2018, 401(k) plans with over $1 billion in assets made up only 0.1 percent of all plans in the United States, or, in other words, only 659 401(k) plans out of 586,622 401(k) plans had more than $1 billion in assets.[3]  As a jumbo plan, the Plan had substantial bargaining power to obtain the most cost-efficient investments and favorable pricing for Plan administrative services. Defendants, however, did not exercise appropriate judgment in scrutinizing each investment option, initially and on an ongoing basis, that was offered in the Plan to ensure it was prudent nor did they adequately negotiate favorable administrative services fees.

11.     The Plan is also large in terms of the number of its participants.  From 2018 to the beginning of 2022 the Plan had over 25,000 participants with account balances. The 2018 Form 5500 filing of the Salesforce 401(k) Plan at 2 ("2018 Form 5500"). By the end of 2021/beginning of 2022 the number of participants had reached 49,000. The 2021 Form 5500 filing of the Salesforce 401(k) Plan at 2 ("2021 Form 5500"). For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b) in the country with 20,000 to 29,999 participants with account balances and for plans with between 40,000 and 49,000 participants, the size the Plan had increased to by 2020 and 2021, there were only 54 plans in the country with this number of participants as of 2020.

12.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of risk and performance and (2) failing to control the Plan's Recordkeeping and Administration costs ("RKA").

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.   Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.  THE PLAN'S INVESTMENTS

18.     Several funds were available to Plan participants for investment each year during the putative Class Period.  As of December 31, 2018, the Plan held twenty-seven investment options which were all mutual funds.  Plan participants also had access to additional investment options through a brokerage link.  Financial Statements at 13.

19.     The Plan's assets under management for all funds as of December 31, 2018 was $2,018,134,000 and by 2021 the assets under management had risen to more than $6 billion dollars to a

staggering $6,093,957,000. Financial Statements at 5 and the 2021 Financial Statement attached to the 2021 Form 5500 ("2021 Financial Statement") at 8.

20.     At year-end 2014, the Plan's assets included the Blackrock Equity Dividend Fund K Shares.  *See* Appendix A, Salesforce 401(k) Schedule of Assets from 2014 through 2022.  In 2022, it became the Blackrock Equity Dividend Fund T.  The JPMorgan target date funds also populated the Plan in one share class or another from the beginning of the putative Class Period to at least the end of 2022. The JPMorgan SmartRetirement R5 share target date funds were in the Plan from 2014 to 2016; the JPMorgan SmartRetirement R6 share target date funds were in the Plan from 2017 to 2018;  the JPMCB SmartRetirement Passive Blend CF-B target date CITs[4] were in the Plan in 2019; the JPMCB SmartRetirement Passive Blend CF-C target date CITs were in the Plan in 2020 and 2021; and the JPMCB SmartRetirement Passive Blend 2020 Fund CF-D were in the Plan in 2022.

21.     Each iteration of the JPMorgan target date funds, whether CITs are mutual funds, are identified and referred to collectively herein as the "JPMorgan Target Date Funds" where applicable.

## IV.     PARTIES

### Plaintiffs

22.     Plaintiff, Chris Simonelli ("Simonelli"), resides in Aubrey, Texas. During his employment, Plaintiff Simonelli was subject to the excessive RKA costs of the Plan described herein and suffered injury to his Plan account by paying fees well above reasonable market rates. In addition, he invested in several of the Plan investment options challenged in this lawsuit.  Specifically, he invested in the JPMorgan Target Date Funds and the Blackrock Equity Dividend fund. He was invested in the JPMSR 2030 R6 from 2018 to the middle of 2019 when the Plan switched to the JPMCB SR PB CF-B and he was mapped to it. Then in 2020 the Plan switched to JPMCB SR PB CF-C and he was mapped to that.  He suffered injury to his Plan account from the significant underperformance of these funds. In addition, Plaintiff Simonelli suffered injury to his Plan account by having to pay for his share of

---

[4] The JPMCB SmartRetirement Pasv Blnd is a Collective Investment Trust ("CIT").  A CIT is a tax-exempt, pooled investment vehicle available only to qualified retirement plans and certain governmental retirement plans (as defined in Internal Revenue Code Section 414(d)). Many CITs have a similar structure to mutual funds.

consulting fees to maintain any of the lower performing funds in the Plan and to assist with the suitability of RKA costs whether specifically identified herein or not, as described below.

23. Plaintiff, David Villarreal ("Villarreal"), resides in Bulverde, Texas. During his employment, Plaintiff Villarreal was subject to the excessive RKA costs of the Plan described herein and suffered injury to his Plan account by paying fees well above reasonable market rates. In addition, he invested in several of the Plan investment options challenged in this lawsuit. Specifically, Plaintiff Villarreal invested in the JPMorgan Target Date Funds and the Blackrock Equity Dividend fund. In 2019, he first invested in the JPMCB SR PB 2030 CF-B fund. He suffered injury to his Plan account from the significant underperformance of these funds. In addition, Plaintiff Villarreal suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing funds in the Plan and to assist with the suitability of RKA costs whether specifically identified herein or not, as described below.

24. Plaintiff, Joeseph Douillard ("Douillard"), resides in Quincy, Massachusetts. During his employment, Plaintiff Douillard was subject to the excessive RKA costs of the Plan described herein and suffered injury to his Plan account by paying fees well above reasonable market rates. In addition, he invested in several of the Plan investment options challenged in this lawsuit. Specifically, Plaintiff Douillard invested in the JPMorgan Target Date Funds. In 2021, he was invested in the JPMCB SR PB 2040 CF-D fund. He suffered injury to his Plan account from the significant underperformance of this fund. In addition, Plaintiff Douillard suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing funds in the Plan and to assist with the suitability of RKA costs whether specifically identified herein or not, as described below.

25. Plaintiff, Marc Runyard ("Runyard"), resides in Everett, Washington. During his employment, Plaintiff Runyard was subject to the excessive RKA costs of the Plan described herein and suffered injury to his Plan account by paying fees well above reasonable market rates. In addition, Plaintiff Runyard suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing funds in the Plan and to assist with the suitability of RKA costs whether specifically identified herein or not, as described below.

26.     Plaintiff, Mark Tracey ("Tracey"), resides in Scottsdale, Arizona. During his employment, Plaintiff Tracey was subject to the excessive RKA costs of the Plan described herein and suffered injury to his Plan account by paying fees well above reasonable market rates. In addition, he invested in several of the Plan investment options challenged in this lawsuit. Specifically, Plaintiff Tracey invested in the JPMorgan Target Date Funds. He was invested in the JPMSR 2025 R6 from 2018 to the middle of 2019 when the Plan switched to the JPMCB SR PB CF-B and he was mapped to it. Then in 2020 the Plan switched to JPMCB SR PB CF-C and he was mapped to that, by 2021 the Plan switched to JPMCB SR PB CF-D and he was mapped to that and by 2023 the Plan switched to the JPMCB SR PB CF-E and he was mapped to that. He suffered injury to his Plan account from the significant underperformance of this fund. In addition, Plaintiff Tracey suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing funds in the Plan and to assist with the suitability of RKA costs whether specifically identified herein or not, as described below.

27.     Plaintiff, Robert Ramirez ("Ramirez"), resides in Lantana, Texas. During his employment, Plaintiff Ramirez was subject to the excessive RKA costs of the Plan described herein and suffered injury to his Plan account by paying fees well above reasonable market rates. In addition, he invested in several Plan investment options that are challenged in this lawsuit. Specifically, Plaintiff Ramirez invested in the JPMorgan Target Date Funds. He was invested in the JPMSR 2030 R6 from 2018 to the middle of 2019 when the Plan switched to the JPMCB SR PB CF-B and he was mapped to it. Then in 2020 the Plan switched to JPMCB SR PB CF-C and he was mapped to that and by 2021 the Plan switched to JPMCB SR PB CF-D and he was mapped to that. He suffered injury to his Plan account from the significant underperformance of this fund. In addition, Plaintiff Ramirez suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing funds in the Plan and to assist with the suitability of RKA costs whether specifically identified herein or not, as described below.

28.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and was injured by Defendants' unlawful conduct.  In particular, each Plaintiff suffered injury because of the underperformance of the Plan's JPMorgan Target Date Funds and Blackrock Equity Dividend fund.  Additionally, each Plaintiff suffered injury to their Plan account by

having to pay for their share of consulting fees to maintain any of the lower performing funds in the Plan and to assist with the suitability of RKA costs. From 2019 to 2021, the Plan paid Strategic Advisors a total of $608,907 to aid the Plan Fiduciaries in maintaining and selecting the investments in the Plan as well as to advise on the appropriateness of the Plan's RKA costs.

29.     Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

30.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

31.     Salesforce is the Plan sponsor with a principal place of business in San Francisco, California. *See* 2018 Form 5500 at 1. Salesforce describes itself as "a customer relationship management solution that brings companies and customers together. It's one integrated CRM platform that gives all your departments — including marketing, sales, commerce, and service — a single, shared view of every customer.[5]

32.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons. First, the 2019 Summary Plan Description ("SPD") identifies Salesforce as the "Plan Administrator." *See* Salesforce 401(k) Summary Plan Description, Effective January 2, 2019 at 3.

---

[5] *See* https://www.salesforce.com/products/what-is-salesforce

33.     Second, as part of its fiduciary responsibility, Salesforce designated Fidelity Investments Institutional ("Fidelity"), as the Plan's recordkeeper.  *Id.*  at 2, and *see also*, the 2018 Form 5500 at Schedule C, page 4.  Salesforce also appointed other Plan fiduciaries in its role as a Plan Administrator and through the Board (see below).  Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

34.     Third, Salesforce also made discretionary decisions to make matching and discretionary contributions (explained below) to Plan participants.  2019 SPD at 4.

35.     Lastly, at all times, Salesforce acted through its officers to perform Plan-related fiduciary functions.  These officers were acting in the course and scope of their employment.

### Board Defendants

36.     The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions.  Upon information and belief, the Board appointed members of the Committee.  Investment Policy at 4.  Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

37.     The Board also had discretionary authority to make contributions to Plan participants' accounts.  *See* Salesforce 401(k) Summary Plan Description, Effective January 2, 2019 ("SPD") at 6.

38.     During the Class Period, Chief Executive Officer Marc Benioff ("Benioff") served on the Board as Chairman.

39.     Mr. Benioff, and each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee and other Plan fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

40.     The members of the Board of Directors for Salesforce during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

41.     The Committee "has been appointed by the organization to supervise, monitor and evaluate the investment of Plan assets."  Investment Policy at 4.  Among other things, the Committee is charged with the following responsibilities:

- Identifying investment options or funds which it deems appropriate and prudent to make available to Plan participants;

- Selecting qualified investment funds;

- Selecting a qualified Trustee and Recordkeeper, as required;

- Reviewing the investment results of the funds;

- Reviewing that the costs (direct and indirect) of the Plan's service providers including but not limited to investment funds, trustee, recordkeeper, auditors, attorney, and investment advisers are reasonable and disclosed to the extent required under ERISA Section 408(b)(2).

- Taking appropriate action if objectives are not being met or if policy and guidelines are not being followed.

*Id.* at 4-5.

42.     Additionally, "[t]he Committee, along with any and all other Plan fiduciaries, is responsible for ensuring that the investment program and each investment option are managed: […] Prudently and in compliance with ERISA and all other applicable laws and regulations and […] For the exclusive benefit of Plan participants and beneficiaries."  *Id.*  at 4.

43.     Further, "[f]rom time to time, the Committee at its discretion, may add investment options/categories to the current core options."  *Id.* at 7.

44.     Additionally, the Committee had monitoring responsibility for the brokerage window.  "If permitted by the Committee, participants may direct the investment of their Plan account through an individual brokerage window under the Plan."  *Id.* at 7.  Further, "[t]he individual brokerage window will be reviewed periodically as determined by the Committee based on criteria determined by the Committee."  *Id.*

45.     Lastly, the Investment Policy gave the Committee great latitude in selecting investment fund types.  "The Committee will select investment options that are liquid, diversified and cost efficient."

*Id.* at 8.  Specifically, the "Committee may select registered mutual funds, collective investment trusts or separately managed accounts for the Plan investments." *Id.*

46.     During the Class Period the following Salesforce employees served as members of the Committee:

- Joseph Allanson ("Allanson") – Executive VP, Chief Accounting Officer
- Stan Dunlap ("Dunlap")  – Senior VP Global Rewards
- Joachim Wettermark ("Wettermark") - SVP, Treasurer

47.     The Committee and each of its members, including Allanson, Dunlap, and Wettermark, were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

## V. CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between February 9, 2018 to the date of judgment (the "Class Period").[7]

49.     Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g., In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

[7]  Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

50.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 25,849 Plan "participants with account balances as of the end of the plan year."  *Id*. at p. 2.

51.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

52.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

       A.     Whether Defendants are fiduciaries of the Plan;

       B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

       C.     Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

       D.     The proper form of equitable and injunctive relief; and

       E.     The proper measure of monetary relief.

53.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

54.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members

of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

55.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    THE PLAN

56.    "The Plan is a multiple employer defined contribution plan that was established in 2000 by [Salesforce] to provide benefits to eligible employees."  Financial Statements and Supplemental Schedules (attached to 2018 Form 5500) ("Financial Statements") at 7.  With regard to the two participating companies in the Plan, "Salesforce.com, Foundation" contributes 2.7% to the Plan while Salesforce contributes 97.3%.  *See* Attachment to 2018 Form 5500, Multiple-Employer Plan Information.

57.    "The purpose of the plan is to enable eligible Employees to save for retirement."  SPD at 1.

58.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

59.    In general, all employees are eligible to participate in the Plan. SPD at 4.

### *Contributions*

60.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, employer paid bonuses, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions.  SPD at 6.  Additionally, Salesforce "may make discretionary nonelective contributions in an amount to be determined by the Board of Directors for each Plan Year."  *Id.*

61.     With regard to employee contributions, the percentage a participant defers "is subject to an annual limit of the lesser of 50.00% of eligible compensation or $19,000 (in 2019)." *Id.* at 5.

62.     "Discretionary matching contributions, if made, will be computed by [Salesforce] based on [the participant's] eligible compensation deferred into the Plan each Plan Year." *Id.* at 6.

63.     "Prior to March 1, 2017, the Company matched the lesser of 50 percent of each eligible participant's contributions up to a maximum of 6 percent of eligible annual compensation or $4,000 per calendar year." Financial Statements at 7. "Effective March 1, 2017, the Company increased the amount in which a participant's contributions would be matched to 100 percent of each eligible participant's contributions up to the lesser of 6 percent of eligible annual compensation or $5,000 per calendar year." *Id.*

64.     Like other companies that sponsor 401(k) plans for their employees, Salesforce enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.  *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

65.     Salesforce also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

66.     Given the size of the Plan, Salesforce likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

67.     A participant is 100 percent vested at all times in their "Rollover Contributions, Employer Matching Contributions, After-Tax Contributions, Qualified Nonelective Contributions, Deferral Contributions and any earnings thereon." *Id.* at 8-9.  Nonelective Contributions are vested in accordance with a sliding scale depending on years of service (between less than 1 and 5 years of service.  *Id.* at 9.  Those with less than a year of service have zero percent vested while those with 5 years of service have 100% vested.  *Id.*

## VII. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A. Overview

#### 1. ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments

68.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

69.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.  As noted above, these fiduciary duties are the highest known to the law. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

70.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

71.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

72.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

73.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

74.     Acting in the sole interest of plan participants is all encompassing.  A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

75.      A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

76.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

77.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which increase the likelihood that participants reach/live their preferred lifestyle in  retirement.

78.     The specific methodologies used to select prudent investments are primarily data driven. Such data is provided by investment research companies like Morningstar, which is the most accepted source of investment performance information, as it has the most robust information on mutual funds, CITs, and other types of investments.  Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

79.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

80.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.")

81.     Lastly, to the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022).  That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

**2.     The Target Date CITs in the Plan**

82.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's JPMorgan Target Date Funds.

83.     During the majority of the Class Period, the Plan included in its menu of investment offerings the materially underperforming JPMorgan Chase Bank SmartRetirement Passive Blend CF Share Classes of the JPMorgan Target Date Funds.[9] At the start of the Class Period, the Plan was invested in the underperforming JPMorgan SmartRetirement R6 share class.  In 2019, the Plan replaced the JPMorgan SmartRetirement R6 Share Class with the JPMCB SR PB CF Share Class which was an equally poor choice.

---

[9] As explained above, in 2018 the JPMorgan Target Date Funds in the Plan were the JPMorgan SmartRetirement R6 share classes.  Beginning in 2019, the Plan maintained the CF-B share class of this investment. In 2020, the Plan moved the share class of this investment to the CF-C share class and later moved to the CF-D share class. However, for purposes of the Complaint, the entire target date series shall be referred to as the JPMorgan Target Date Funds to represent all possible share classes of this investment during the Class Period. Where a specific share class is referenced, a reference to the appropriate share class will be made.

84.     By 2021, the Plan had nearly half of its total assets of $6 billion dollars, more than $2.9 billion dollars, invested in the JPMCB SR PB CF Share Class. 2021 Auditor Report at 15. With such a large amount invested in the JPMCB SR PB CF Share Class, the Plan would have been able to choose virtually any available target date funds for the Plan and paid the lowest fees available for these funds either in 2021 or by the start of the Class Period.

85.     Defendants, in particular the Committee, were under an obligation under ERISA to carefully evaluate the JPMorgan Target Date Funds, in particular the JPMCB SR PB CF Share Class before selecting them for inclusion in the Plan. The Committee was also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the JPMorgan Target Date Funds on an ongoing basis thereafter.

86.     Target date funds are designed to provide a single diversified investment vehicle for plan participants. The target date refers to the participant's expected retirement year. For example, "target date 2030" investments are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the investment's manager adjusts the underlying asset mix to become more conservative.

87.     The first target date investments in the industry were mutual funds offered as early as 1994, and since then the market for target date investments has exploded with numerous investment managers offering a variety of different target date investments, mutual funds and CITs alike.

88.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years of more.

89.     Multiple types of assets are included in a target date investment portfolio, including equity (stock) and fixed income (bond) securities. Target date investments offer diversity and balanced exposure to a broad array of underlying securities included in the investment.

90.     Established target date investment managers include, but are not limited to, American Funds, Callan, TIAA-CREF and T.Rowe Price. T.Rowe has offered target date funds for more than 20 years and American Funds, TIAA-CREF and Callan for approximately 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.

**3.     The BlackRock Equity Dividend Fund**

91.    The Plan included as an investment, the BlackRock Equity Dividend Fund K investment, ticker MKDVX ("BlackRock Dividend"), which is a Large Value fund.

92.    Large Value funds have their own Morningstar Category, namely the Morningstar Large Value Category. In 2019, for example, there were 1,209 funds that made up the Large Value Category. Similarly, the Large Value Category has its own index which was created by Morningstar to track how an average fund in this category should perform, this index is known as the Morningstar US Large-Mid Cap Broad Value USD Index, SecID F00001668Q, ("Large Value Index").

**B.    The Plan's Fidciuaries Failed to Adequately Monitor and Remove the Challenged Plan Invesments**

**1.    The Challenged Investments Materially Underperformed Relative to Comparator Target Date Funds and Indexes**

*The JPMorgan Target Date Funds*

93.    Leading up to the start of the Class Period, the JPMorgan Target Date Funds consistently materially underperformed industry-accepted benchmarks for target date investments used by investment professionals.

94.    The JPMorgan Target Date Funds can be compared to various similar target date investments ("Comparator Funds") and relevant indexes ("Comparator Indexes") as benchmarks. Suitable Comparator funds include the Callan GlidePath® Fund CL Z,  T. Rowe Price Ret Hybrid Tr-T7, American Funds Trgt Date Retire R6, T. Rowe Price Retirement Tr-, D, and TIAA-CREF Lifecycle Index Instl. These target date investments are suitable Comparator Funds to the JPMorgan Target Date Funds, including the JPMCB SR PB CF Share Classes and other JPMorgan Target Date Share Classes in the Plan during the putative Class Period because Morningstar places all of the investments in the US Target-Date 2020-2055 Category or the US SA Target-Date 2022-2055 Category ("Target Date Category").[10] There

---

[10] Although the JPMCB SR PB CF Share Class is a CIT and some of the Comparator Funds are mutual funds, the Comparator Funds are accurate comparators because the underlying holdings of CITs and their corresponding mutual fund versions have identical managers and perform in a nearly identical fashion with the primary difference being cost. However, the total returns of all the funds are net of cost thus making cost comparisons immaterial.

are, at least, 400 other similar investments in the Target Date Category. Morningstar compares investments to how an average investment in a particular category should perform by using the Morningstar Lifetime Moderate Index.

95.    The performance of the JPMorgan Target Date Funds lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

96.    Beginning in 2013, using the 2040 target date investment as an example, the JPMCB SR PB CF Share Class, specifically the 2040 target year ("JPMCB SR PB CF 2040 Investment"), ranked in the 54th percentile out of 218 available funds in this category.[11] By 2014, when a three-year history was finally available for the JPMCB SR PB CF Share Class, the chart below demonstrates that JPMCB SR PB CF 2040 Investment consistently fell below its Index in red, namely the Morningstar Lifetime Mod 2040 TR USD Index ("Index"), while the Comparator Funds, the Callan GlidePath 2040 investment, the TIAA-CREF Lifecycle 2040 Index investment, the T.Rowe Price Retirement 2040 investment[12] and the American Funds 2040 investment (just as a representative example) consistently performed well above the Index.[13] And, as discussed below, there were vastly better choices that could have been selected for the Plan.[14]

///

///

---

[11] This data is derived from the Morningstar report for this investment as of October 25, 2023.

[12] Although the selected comparator funds, T. Rowe Price Retirement Tr-D target date series and Callan GlidePath Fund CL Z didn't become available until 2014 and late 2011 respectively, the T. Rowe Price Retirement and the Callan GlidePath Fund CL R6 investment are analyzed as a higher share class of this fund. The Tr-D and the CL Z classes have lower expenses than the T. Rowe Price Retirement and the Callan GlidePath Fund CL R6. Therefore, the Tr-D and CL Z classes would be expected to have actually performed better than the lower share classes included in this chart.

[13] This performance data is prepared on a total return basis, or, in other words, the returns realized by each fund are reduced by the amount of fees associated with each fund also commonly referred to as net of fees.

[14] In this case, both possible Morningstar Categories, namely the US Fund Target Date 2040 Category and the US SA Target Date 2040 Category, being a Morningstar Category for CIT based target date funds, tracked the appropriate index fairly closely making this fund ranking analysis generally accurate for each year being analyzed.



97.     According the Plan's own IPS, the Committee must select and monitor funds in the Plan "on a quarterly basis, [by] evaluat[ing] each investment option in terms of its performance compared to the relevant benchmarks such as market indices and peer groups over trailing quarter- and year-to-date, one- three-, five- and ten-year periods." IPS at 9. In addition, the Plan's own IPS provides that any fund that fails to outperform its benchmark for "the fund's investment category for three consecutive quarters …" should be placed on a watchlist with replacement warranted as early as the next quarter of underperformance. IPS at 10. Under ERISA, the IPS becomes part of the legal document governing the Plan and the Plan fiduciaries are obligated to follow it. *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241-42 (2d Cir. 1989). The Plan fiduciaries failed in this regard. It's inexplicable why a fund would have been chosen for the Plan in 2018 when its performance history would indicate it imprudent for the Plan (*e.g.,* its performance history would have placed it on a watchlist and warranted it removed during 2014 and 2015 on a three-year average had it been an investment in the Plan).

98.     Had the Plan fiduciaries been following their own IPS, the JPMCB SR PB CF Share Class would not have been eligible to be selected for the Plan. It's inexplicable why the Plan Fiduciaries would

have chosen a target date series for the Plan that would have been on the Plan's own watchlist roughly two years prior to its selection for the Plan.

99.    During the Class Period, the JPMCB SR PB CF Share Class did not perform any better. The chart below demonstrates its underperformance:



100.    As seen in the chart above, the JPMCB SR PB CF Share Class consistently underperformed its Index for three consecutive years from the middle of 2018 through the end of 2021 quarterly and using a three-year average. Nonetheless, the JPMCB SR PB CF Share Class was maintained in inexplicable violation of the IPS. As discussed above, the Plan's own IPS requires that any investment that underperforms its index for more than three consecutive quarters should be placed on a watchlist and removed as early as the fourth quarter of underperformance. The fact that JPMCB SR PB CF Share Class had already significantly underperformed for 4 consecutive quarters in 2014 and again in mid-2018 and this should have been an indicator to the Plan fiduciaries that this fund was an imprudent investment for the Plan.

101.    To make matters worse, the JPMCB SR PB CF 2040 Investment had some of the worst fund rankings in the Target Date Category whose funds are intended to track the appropriate index, the Lifetime Moderate 2040 TR USD, ticker MSAAM40M ("2040 Index"). In 2018, it ranked in the 56th percentile out of 239 possible funds, in other words, there were 133 better performing funds in its category. In 2019 the fund ranked in the 58th percentile out of 241 funds in its Target-Date 2040 Category or in other words, there were 139 better performing funds the Plan fiduciaries could have selected although as fiduciaries having the sole interests of the Plan participants in mind, the Defendants should have chosen a fund in the top 25% in its Category. In 2020, the fund ranked in the 78th percentile out of 218 funds meaning that there were 170 better performing funds in this category. There were years when the fund ranked higher, but this is only evidence of the fund's lack of stability. This data was or should have been available to the Plan fiduciaries before and during the Class Period in real time. Similar results are seen for each target year, 2025 through 2055, in the JPMCB SR PB CF Share Class.[15]

102.    During 2018 and mid-2019, as discussed above, the Plan maintained the chronically underperforming JPMorgan Target Date Funds. Clearly, these funds had underperformance issues and should have been replaced with one of the better performing Comparator Funds as early as the start of the Class Period if not sooner. It's inexplicable why the Plan fiduciaries decided to wait until mid-2019 to replace the JPMSR Series. The shortcomings of the JPMorgan Target Date Funds will be discussed in more detail in Section B(2), below.

### 2.    Modern Portfolio Theory Demonstrates the Imprudence of the JPMorgan Target Date Funds

103.    There is no justifiable excuse for having allowed the challenged investments to languish in the Plan for so long without taking any action at all. Investment professionals and fiduciaries charged with putting the interests of plan participants use or should use Modern Portfolio Theory or MPT to help determine, along with underperformance data, that an investment strategy has been historically flawed for a particular fund.

104.    The Restatement of Trusts describes the duty to use MPT or similar strategy as follows:

---

[15] A performance analysis for each target date year beginning with 2030 in the JPMCB SR PB CF Share Class against the appropriate Index and Comparator Funds is attached at Appendix "B."

"[t]his standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust". UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) (*See Birse v. CenturyLink, Inc.*, 2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

105.    "Modern portfolio theory has been adopted in the investment community and, for the purposes of ERISA, by the Department of Labor. *See* 29 C.F.R. § 2550–404a–1 (directing plan fiduciaries to consider, *inter alia*, 'the role [an] investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties')… 'Under ERISA, the prudence of investments or classes of investments offered by a plan must be judged individually…. That is, a fiduciary must initially determine, and continue to monitor, the prudence of each investment option available to plan participants. Here the relevant 'portfolio' that must be prudent is each available Fund considered on its own…not the full menu of Plan funds." *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 423 (4th Cir. 2007)

106.    Using MPT, fiduciaries quantify an investment's strategy on an absolute and relative volatility basis. MPT allows fiduciaries to gauge the amount of risk necessary for a fund to meet or exceed the appropriate index. Standards at any given time are set by all the funds in a Morningstar Category and those funds performing below the index and category need to consider the strategies utilized by the better performers and make adjustments as necessary.

107.    There are many MPT factors, but Total Return, Sharpe Ratio, Information Ratio, and Standard Deviation  may be used, individually and aggregately, to determine how well investment managers achieve returns given actual and relative risk and volatility.  Simply stated, Total Return is a simple measure of investment performance net of implicit portfolio costs; Sharpe Ratio is a commonly used measure of risk-adjusted return; Information Ratio is a commonly used measure of risk-adjusted return relative to a market index common to the Peer Portfolios; and Standard Deviation is a commonly used measure of risk based on periodic fluctuations of returns.

108.   Looking at MPT statistics for the JPMCB SR PB CF Share Class  as compared to the Comparator Funds clearly shows why the JPMCB SR PB CF Share Class was imprudent and was not selected or maintained with the sole interest of Plan participants in mind.

109.   Each Comparator Fund used herein was selected according to a *systematic computational process* that evaluated all share classes of the JPMorgan Target Date Funds, including the JPMCB SR PB CF Share Class, against every no-load fund or CIT available in the retirement marketplace, specific to portfolios classified with the same Morningstar Category as the JPMorgan Target Date Funds (each a "Peer Portfolio," and collectively, the "Peer Portfolios").

110.   The JPMorgan Target Date Funds, including the CB SR PB CF Share Class and each of the candidate Peer Portfolios were evaluated according to the above (4) criteria calculated over historic five-year periods, compiled from monthly returns sourced from the Morningstar vendor dataset.

111.   The process was re-run at the beginning of each year in the period. For example, as seen in Appendix "C," the 12/31/17 data was compiled from month by month data beginning at 12/31/13 through 12/31/17.  A composite score was calculated and assigned to the JPMorgan Target Date Funds, including the JPMCB SR PB CF Share Class and each Peer Portfolio based on the evaluation criteria, and averaged across all periods.  The Peer Portfolios were then sorted by composite score.  Replacement Assets were selected from among the top ranked Peer Portfolios for the JPMorgan Target Date Funds, including the JPMCB SR PB CF Share Class.

112.   Accordingly, attached as Appendix "C" is a detailed ranking data, evaluation statistics, and other criteria for the top Peer Portfolios from which the Comparator Funds were selected using the methodology discussed above. This analysis shows that the JPMCB SR PB Share Class as well as the JPMSR Share Class had ranked well below the Comparator funds before the Class Period and after it. For example, looking at 2040 as an example year, the JPMSR 2040 investment which was in the Plan in 2018, had a composite ranking of the 60th percentile out of 307 available funds. Similarly by 2020, once the JPMCB SR PB 2040 Investment had been in the Plan for one full year, it had a dismal composite ranking in the 83rd percentile out of 330 available funds. Similar results are seen for all target date years in each series as detailed in Appendix "C." These facts demonstrate that not only did these JPMorgan Target Date Funds underperform but it also exposed participants to unnecessary risk and volatility as measured by the

Sharpe Ratio, Information Ratio and Standard Deviation at Appendix "C." It's inexplicable why these JPMorgan Target Date Funds were not replaced with one of the better performing Comparator Funds as early as the start of the Class Period.

### The BlackRock Equity Dividend Fund Significantly Underperformed Its Peers and Benchmarks

113.    Using a rolling three-year average performance by quarter, on a total return basis, it's clear that, beginning in early 2019, the BlackRock Dividend investment began to significantly underperform its peers and the Large Value Index. The relevant peer funds are the JPMorgan Equity Income R6 investment, Columbia Dividend Income Institutional investment, Hartford Dividend and Growth F investment, the Parnassus Value Equity Institutional investment ("Large Value Comparator Funds"). The Large Value Comparator Funds are only a small selection of potentially 100s of investments that would have been better choices for the Plan since the Large Value Category is made up of, on average, more than 1,200 investments in any given year and the Large Value Index is meant to track the average performance in this Category.

114.    In addition, the BlackRock Dividend investment had some of the worst Morningstar rankings in the Large Value Category. In 2021 the fund ranked in the 91st percentile, meaning that out of the 1,207 funds available that year, 1,100 of them would have been better choices for the Plan.

115.    The Large Value Comparator Funds are accurate and meaningful comparators to the Fundamental Investor fund because all four funds concentrate their holdings in the Large Value Category. It's largely this holding concentration which causes each of these funds to be placed in the Large Value Category by Morningstar. All of the more than 1,000 funds placed in this Category by Morningstar share a similar holdings concentration.

///

///

///

///

///

///

116.    The chart below, using a 3-year rolling average by quarter, on a total return basis, demonstrates that the Large Value Comparator Funds performed generally well above the Large Value Index, in red, while the BlackRock Dividend investor, in black, performed generally well below this Index.



117.    As demonstrated above, the BlackRock Dividend investment, in black, began showing signs of underperformance in the second quarter of 2019 and never recovered. Although the fund tracked slightly above the average of all funds in the Large Value Category, by 2019, this category average began to significantly underperform the category index, the Large Value Index. This should have been a signal to the Plan fiduciaries that the BlackRock Dividend investment was clinging to an ineffective strategy and required that it be removed as a Plan investment option.

118.    Given the long history of underperformance of the BlackRock Dividend investment, it's clear that this investment was an imprudent choice and should not have been selected for the Plan initially

but at the very least should have been replaced early in the Class Period.

### Modern Portfolio Theory Demonstrates the Imprudence of the BlackRock Dividend investment

119.     Similar to the JPMorgan Target Date Funds discussed above, the BlackRock Dividend investment not only underperformed its benchmark but it had significant risk and volatility issues making it an imprudent choice. Attached hereto as Appendix "D", using the same methodology as for the target date series at Appendix "C", is detailed ranking data, evaluation statistics, and other criteria for the top Peer Portfolios from which the Comparator Funds were selected.

120.     As expected, on a five year average in 2021, the fund had a composite rank in the 46th percentile out of 757 funds in its peer group. Such a low ranking exposed participants needlessly to excessive risk and volatility while delivering poorer returns. There's little doubt the BlackRock Dividend investment was an imprudent choice for continued inclusion in the Plan and should have been replaced as soon as it showed serious signs of deterioration in 2019.

### VIII.    THE PLAN'S RECORDKEEPING FEES DURING THE CLASS PERIOD WERE UNREASONABLE

#### A.   ERISA's Fee Disclosure Rule

121.     In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [16]

122.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

---

[16] *See, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

123.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

124.    The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

125.    A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

126.    Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants.  Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)."  29 CFR § 2550.404a-5(C)(2)(ii)(B).

**B.    Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants**

127.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

128.    Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.  Numerous recordkeepers in the marketplace are capable of providing a

high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

129.    There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

> A.    Basic account recordkeeping (e.g. demographic, source, investment and vesting records);
>
> B.    Multi-channel participant and plan sponsor access (e.g. phone, web);
>
> C.    Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);
>
> D.    Payroll service (e.g. hardships, in-service withdrawals, termination distributions);
>
> E.    Participant tax reporting services (e.g., IRS Form 1099-R);
>
> F.    Participant confirmations, statements, and standard notices;
>
> G.    Plan-level reporting and annual financial package (excluding IRS Form 5500);
>
> H.    Participant education (e.g. newsletters, web articles, standard communication materials);
>
> I.    Plan consulting (e.g., preapproved document services, operational materials);
>
> J.    Plan consulting (e.g. preapproved document services, operational compliance support).

130.    These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

131.    The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  Recordkeepers for large 401(k) plans such as Vanguard and Fidelity invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

132.    The way it works, in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns.  In this manner a participant's account is somewhat similar to a

simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping for a participant's account with a balance of $500,000, is the same as for a participant whose account balance is $5,000 in the same plan.

133.   The cost of providing recordkeeping services thus often depends on the number of participants in a plan.

134.   When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See*, 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.") [17]   Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.[18]

135.   Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

136.   Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan.  Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

137.   Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns. There is no rational economic reason for the record keeper, or account administrator to receive increased revenues simply based upon increased

---

[17] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

[18] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

investment returns, and increased account balances, or employee additional retirement savings' contributions.

138.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

**C.  Much Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Defendants**

139.    As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants. The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

140.    Other information has also not been made available to Plaintiffs.  For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, a RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

141.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years."  These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[19]

---

[19] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

142.    Generally, any RFPs, if conducted, would not be made available to plan participants.  The same is true for Plaintiffs here who do not have direct access to such information.

143.    Additionally,  documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.   Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

144.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that's not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

145.    In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

146.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

147.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants.

**D. Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees**

**1. The Plan's Recordkeeping Services Agreement with Fidelity Offered Routine Services**

148.    The Plan's recordkeeper throughout the Class Period was Fidelity. Fidelity utilizes a standard contract for its recordkeeping services. A sample is attached hereto at Appendix "E" ("Fidelity Standard Contract").

149.    In the Fidelity Standard Contract, Fidelity agrees to provide participant services, plan accounting, participant reporting, plan reporting, government reporting (*e.g.* Form 5500s), and communication and education services. *Id.*

150.    The Fidelity Standard Contract does not identify any unique services Fidelity would have to provide to the Plan that would make the recordkeeping services provided to the Plan differ in any material way from recordkeeping services provided by Fidelity or other nationally recognized recordkeepers to other jumbo plans like the Plan.

**2. There is No Indication Defendants Conducted RFPs at Reasonable Intervals**

151.    As noted above, 408(b)(2) disclosures are not available to plan participants.  By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either.  Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

152.    Here it appears the Defendants failed to conduct a formal RFP in the years leading  up to the start of the putative Class Period.  The fact that the Plan had the same recordkeeper in place, namely Fidelity, from the start of the Class Period with little meaningful change in the already excessive RKA rates strongly suggests that the Plan fiduciaries failed to act in the best interests of Plan participants when they failed to genuinely attempt to seek a competitive market rate for RKA fees. Had the Defendants

genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

153.    In 2020, Fidelity, was one of the top recordkeepers nationally as measured by assets being recordkept as demonstrated in the chart, below:

**2020 TOP PROVIDERS (RECORDKEEPERS)[20]**

| Top 10, by Total 401(k) Assets ($MM) | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

154.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any recordkeeper including any of the above recordkeepers who were peers of Fidelity and capable of providing lower recordkeeping fees as will be shown below.

155.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

156.    Starting in 2018, Fidelity charged a per participant RKA rate of $37. As discussed below, this rate was well above the reasonable RKA costs for a plan the size of this Plan during the same time period. There was a modest change in price in 2020 to $33 per participant and to $27 per participant in 2021. However, "a high fee may reflect imprudence even if the fee falls year-over-year." *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-cv-01493, 2021 WL 3417843, *4 (W.D. Pa. Aug. 3, 2021). These rates continued to exceed, by far, the reasonable rate for a plan the size of the Plan.  Again, had the Defendants

---

[20] *See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/*

sought an appropriate market rate through an RFP, it's likely either the recordkeeper would have been changed at some point or Fidelity would have agreed to its own admitted rate of $14-$21 per participant or less (discussed below) throughout the Class Period.

### 3. The Fidelity Stipulation

157.     In a recent lawsuit where Fidelity's multi-billion dollar plan with  at least 58,000 participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

158.     Specifically, Fidelity stipulated as follows:

> "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period*** (November 18, 2014 to the present)."

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

159.     The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics.  The Plan had nearly the same number range of participants that the Fidelity plan had  and was also a billion dollar plan like the Fidelity plan.

160.     Additionally, at the start of the Class Period in 2018, Fidelity was the recordkeeper, at which time the Fidelity stipulation stated the value of the type of services being received by the Plan was $14 per participant per year.  Given the trend of diminishing recordkeeping fees over the last few years (and as borne out by the diminishing fees described in the Fidelity stipulation), the value of the recordkeeping services provided to the Plan by Fidelity would likely be less than $14 per participant from 2021 to the present.

4.    **Market Surveys, Form 5500s, and other Sources Noted Below are Reliable Sources that show the Plan's Recordkeeping Fees were/are Unreasonable**

161.    During the Class Period, the Plan's per participant total RKA fees were at least as follows:

| Year | Participants | Fidelity Per Participant Charge |
|------|------|------|
| **2018** | 25,849 | $37 |
| **2019** | 30,379 | $37 |
| **2020** | 39,589 | $33 |
| **2021** | 49,396 | $27 |

162.    At all times during the Class Period, the above fees were unreasonable. The above fees were unreasonable when benchmarked against similar plans and against Fidelity's own admitted range of reasonable rates for plans of this size.  As a point of emphasis, in 2020, there were only 54 defined contribution plans (401k, 401a, and 403b) in the country with 40,000 to 49,000 participants with account balances (*see supra* ¶ 11) meaning the Plan fiduciaries had tremendous bargaining power.

163.    For purposes of this Complaint, Plaintiffs compare only the Plan's direct costs with the costs paid by other plans to illustrate the excessive nature of the RKA fees which were more than double a reasonable rate, even just looking at the direct costs.

164.    Looking at recordkeeping costs for plans of a similar size in 2021, as an example year, shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few plans having more than 30,000 participants and more than $3 billion dollars in assets under management:

| Plan Name | Number of Participants | Assets Under Management | R&A Costs on Per-Participant Basis[21] | Record-keeper |
|---|---|---|---|---|
| Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 51,325 | $7,716,754,000 | **$14** | T. Rowe Price |
| Deseret 401(k) Plan | 36,079 | $5,437,144,766 | **$22** | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | **$25** | Great-West |
| The Cargill Partnership Plan | 41,766 | $8,714,511,791 | **$19** | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,103,524321 | **$27** | Vanguard |
| Pacific Architects and Engineers, LLC 401(k) Savings Plan | 14,583 | $693,883,632 | **$6** | Fidelity |
| The Vanguard Retirement and Savings Plan | 24,544 | $5,440,681,262 | **$13** | Vanguard |

165.    The above comparisons, considered together with the other data discussed above,  confirm that the Plan's participant size could easily have qualified it for RKA fees of between $14 to $22 from several nationally recognized recordkeepers including Fidelity itself. This is also evident from the Fidelity stipulation mentioned above.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee Defendants)**

166.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

167.    At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

---

[21] RKA costs in this chart are derived from Schedule C of the Form 5500s and reflect fees paid to each plans' recordkeeper. However, as noted in the footnote above, these fees may be higher than the true cost of recordkeeping alone. The cost for recordkeeping alone is available for the Plan because additional data was available due to the fact that the Plaintiffs were Plan participants.

168.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

169.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  The Prudence Defendants also failed to obtain reasonable recordkeeping fees for the Plan.

170.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive administration costs and lower net investment returns.  Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

171.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

172.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Salesforce and the Board Defendants)

173.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

174.    Salesforce and the Board Defendants (the "Monitoring Defendants") had the authority to appoint members of the Committee, and the duty to monitor the Committee.  Further, they were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

175.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

176.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

177.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated,  their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost collective trust vehicles; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

178.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the

Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

179.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

138.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Dated: February 9, 2024                          Respectfully submitted,

                                                 **ROSMAN & GERMAIN APC**
                                                 Daniel L. Germain (State Bar No. 143334)
                                                 5959 Topanga Canyon Boulevard
                                                 Suite 360
                                                 Woodland Hills, CA  91367-7503
                                                 Telephone: (818) 788-0877
                                                 Facsimile: (818) 788-0885
                                                 Email: germain@lalawyer.com

                                                 By: /s/ *Donald R. Reavey, Esquire*
                                                 Donald R. Reavey, Esq.
                                                 (*Pro hac vice admission to be requested*)
                                                 **CAPOZZI ADLER, P.C.**
                                                 2933 North Front Street
                                                 Harrisburg, PA 17110
                                                 (717) 233-4101
                                                 Fax (717) 233-4103
                                                 Email: donr@capozziadler.com

                                                 By: /s/ Mark K. Gyandoh, Esquire
                                                 Mark K. Gyandoh
                                                 (*Pro hac vice admission to be requested*)
                                                 **CAPOZZI ADLER, P.C.**
                                                 312 Old Lancaster Road
                                                 Merion Station, PA 19066
                                                 Tel: (610) 890-0200
                                                 Email: markg@capozziadler.com

                                                 Counsel for Plaintiffs and the Putative Class